## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| TRIBECA HELI, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 1:25-cv-8818 |
| | ) | |
| v. | ) | |
| | ) | |
| ANALAR CORPORATION A/K/A ANALAR | ) | |
| HELICOPTER CORPORATION and THE | ) | |
| ESTATE OF MICHAEL RENZ. | ) | |
| | ) | |
| Defendants. | ) | October 24, 2025 |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

### PLAINTIFF'S COMPLAINT

Plaintiff Tribeca Heli, LLC ("Plaintiff" or "Tribeca"), by and through its undersigned counsel, the Law Offices of Paul A. Lange, LLC, for its Complaint against Defendants Analar Corporation a/k/a Analar Helicopter Corporation ("Analar") and the Estate of Michael Renz (the "Estate", the Estate and Analar collectively "Defendants"), allege as follows:

### NATURE OF THE ACTION

1.      This is an action for money damages and specific performance arising from: (i) Analar's breach of an aircraft purchase agreement; (ii) Analar's breach of an aircraft lease; and (iii) the Estate's failure to comply with its obligations under a personal guaranty that secured payment and performance of all of Analar's respective obligations to Tribeca under the aircraft purchase agreement and the aircraft lease.

### PARTIES

2.      Tribeca is a Delaware limited liability company.

3.      Tribeca's has three individual members, and the state of domicile for each of those members is New York and Florida, respectively.

4.      Tribeca owns that certain Eurocopter model AS365N3 Aircraft bearing Federal Aviation Administration ("FAA") registration number N178MT and manufacturer's Serial Number 6572 (the "Aircraft").

5.      Tribeca financed its purchase of the Aircraft and, as such, the Aircraft is collateral for the subject loan and Tribeca has monthly loan payments, including interest, for the loan.

6.      Upon information and belief, Analar is a New Jersey corporation with its principle place of business in New Jersey.

7.      Upon information and belief, the Estate is a citizen of New Jersey given that the decedent, Michael Rez ("Mr. Renz"), had a domicile of New Jersey at the time of his passing.

8.      Upon information and belief, Laurie Renz ("Mrs. Renz") is the adminstratrix of the Estate.

9.      Analar provides Charter Helicopter Service in New York City, in addition to the operations, maintenance, and management of helicopters and business jets in New York and New Jersey.

10.     At all relevant times, Analar held, and still holds, an air carrier certificate under 14 C.F.R. Part 119 ("Certificate"), permitting Analar to conduct "On-Demand Operations" with its aircraft (as that term is defined in 14 C.F.R. § 110.2).

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendants, and the amount in controversy exceeds $75,000.

12.     Diversity of citizenship exists because Plaintiff is a citizen of Delaware, New York, and Florida, and Defendants are citizens of New Jersey.

13.     Personal jurisdiction over Defendants is proper because: (i) pursuant to various contracts as alleged below, the parties agreed "that any suit, action, or legal proceeding arising out of or relating to" the applicable contracts "shall be brough in the court of … the Southern District Court of New York; … [and] consents to the jurisdiction and court rules in any such court…"; and (ii) pursuant to Analar's own website, Analar "provides Charter Helicopter Service in New York City, in addition to the operations, maintenance, and management of helicopters and business jets in New York and New Jersey."

14.     Pursuant to 28 U.S.C. § 1391, venue properly lies in this Judicial District because: (i) Plaintiff is citizen of New York; (ii) Analar conducts business in New York City; and (iii) pursuant to various contracts as alleged below, Analar "waives any objection which it may have to the laying of such suit, action or proceeding in" the Southern District of New York.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

A.  The Aircraft Lease

15.     On November 19, 2021, Tribeca and Analar entered into an Aircraft Lease concerning the Aircraft (the "Lease").

16.     Pursuant to the Lease, Tribeca Leased the Aircraft to Analar such that Analar could add the Aircraft to Analar's Certificate to conduct On-Demand Operations using the Aircraft.

17.     Under the Lease, Analar could use the Aircraft to conduct such On-Demand Operations to make a profit, in exchange for, among other things, paying Tribeca $19,000 per month in rent ("Rent").

18.     Pursuant to the Lease, Analar "shall be solely responsible for all costs and expenses related to the lease and use of the Aircraft, including without limitation, the cost of maintenance, insurance (including deductibles), fuel, pilots, hangar, services programs, and taxes (including the obligation to remit such taxes to the appropriate authority."

19.     Among other obligations, the Lease required Analar to "maintain, inspect, and repair the Aircraft in accordance with … [Analar's] FAA approved maintenance program, applicable FAA regulations, and the manufacturer's specifications."

20.     Pursuant to the Lease, Analar was obligated to "operate the Aircraft solely for On-Demand charter air transportation services…. [Analar] is solely and exclusively responsible for the use, operation and control of the Aircraft at all times during the Term."

21.     Pursuant to the Lease, Analar agreed to "indemnify and hold … [Tribeca] harmless from any expenses and costs incurred enforcing its rights under … this Lease in general, including attorneys' fees."

22.     The Lease further provided that Mr. Renz individually agreed "to guaranty the performance and obligations of this Lease and will be jointly and severally liable for any losses, expenses, and/or liabilities of … [Tribeca] incurred in relation to this Lease. Further … [Renz] acknowledge[s] and agree[s] that … [Tribeca], in … [its] sole discretion, may pursue any or all remedies set forth herein, against" Mr. Renz.

B.     The Aircraft Purchase Agreement

23.     On November 19, 2021, Tribeca and Analar entered into an Aircraft Purchase Agreement ("APA").

24.     Pursuant to the APA, Analar agreed to purchase the Aircraft from Tribeca for $1,900,000.

25.    The closing for the sale of the Aircraft under the APA was to occur on or before November 20, 2022.

26.    The APA specified that time is of the essence for Analar to close and take delivery of the Aircraft.

27.    The APA provides that:

> "If Purchaser breaches any of its obligations herein, Seller, in Seller's sole discretion, may immediately (i) extend the Closing Date to a date of Seller's choosing, (ii) exercise any remedy or action available to Seller at law or in equity, including specific performance, (iii) sell the Aircraft to any other person or entity, and/or (iv) terminate this Agreement. If Seller exercises it rights under 7(iii), (a) Purchaser will indemnify and hold Seller harmless if the net proceeds of such sale do not equal the Purchase Price and Purchaser will immediately pay such deficiency to Seller, and (b) Purchaser will be responsible for the safe-keeping, hangar, maintenance, insurance, and all other costs and expenses related to the Aircraft until such time Seller sells the Aircraft. Purchaser will indemnify and hold Seller harmless from any expenses and costs incurred enforcing its rights under this Section and this Agreement in general, including attorney's fees. The foregoing rights and remedies shall be cumulative and not exclusive."

28.    The APA further provided that Mr. Renz individually agreed "to guaranty the performance and obligations of this Lease and will be jointly and severally liable for any losses, expenses, and/or liabilities of … [Tribeca] incurred in relation to this Agreement. Further … [Mr. Renz] acknowledge[s] and agree[s] that … [Tribeca], in … [its] sole discretion, may pursue any or all remedies set forth herein, against" Mr. Renz.

C.  The Renz Guaranty

29.    On November 19, 2021, Mr. Renz, Jeffrey Hyman ("Hyman"), and Helo Holdings, Inc. ("Helo") executed a Guaranty in favor of Tribeca ("Guaranty"), securing payment and performance of all of Analar's obligations under the Lease and the APA.

30.     In the Guaranty, Mr. Renz and the other guarantors bound themselves to:

> "[G]uarantee to Tribeca the prompt payment and/or performance of all indebtedness, obligations and liabilities of Analar at any time owing to Tribeca,

whether direct or indirect, matured or unmatured, primary or secondary, certain or contingent, or acquired by or otherwise created in favor of Tribeca, including without limitation any and all purchase payments, rent, loan, or other installment payments, principal balances, taxes, indemnities, liquidated damages, transaction expenses and other reimbursements, administrative charges, all interest, including late charge interest, actual attorneys' fees or enforcement and other costs, which may at any time be payable in connection with the Agreements, together with all claims for damages arising from or in connection with the failure to punctually and completely pay or perform such obligations, whether or not such obligations are from time to time reduced or extinguished and thereafter increased or incurred (collectively, the "Obligations"). This Guaranty is a guaranty of payment and performance, and not a guaranty of collection, and Guarantors hereby undertakes and agrees [sic], that if Analar or Guarantors is [sic] in Default  (defined below) hereunder for any reason, Guarantors shall (i) punctually pay any such Obligations requiring the payment of money, as an obligation for payment due and owing directly from Guarantors to Tribeca and without any abatement, reduction, setoff, defense, counterclaim or recoupment, and (ii) punctually perform any and all Obligations not requiring the payment of money for the benefit of Tribeca, as an obligation for performance due and owing directly from Guarantors to Tribeca. Guarantors shall be deemed to be primarily liable for each Obligation and not merely as a surety thereof."

31.     The obligations of Mr. Renz under the Guaranty "are absolute, unconditional and irrevocable and may not be cancelled, terminated, repudiated or rescinded for any reason…."

32.     The Guaranty further provides as follows:

"If (a) Analar defaults in the payment or performance of any Obligation after expiration of any applicable grace period, or (b) if there exists any event or condition which, constitutes a Default under the Agreements (including any default relating to Guarantors or this Guaranty), or (c) any representation or warranty of Guarantors herein or in any certificate, agreement, statement or document furnished at any time to Tribeca by or on behalf Guarantors (including without limitation, any financial information), shall prove to be or to have been false or incorrect in any material respect; or (d) Guarantors shall fail to perform or observe any covenant (including without limitation, any financial covenants), condition or agreement required to be performed or observed by Guarantors hereunder or in connection with any Obligation, and such failure shall continue for 10 days after receipt of written notice thereof to Guarantors; or (e) if there is a liquidation, bankruptcy, assignment for the benefit of creditors or similar proceeding affecting the status, existence, assets or obligations of Analar or any Guarantors or other party liable to Tribeca in respect of the Obligations (each of the foregoing being hereinafter referred to as a "Default"), then the Obligations of Analar shall, at the sole option of Tribeca, be deemed to be accelerated  and become immediately due and payable by Guarantors for all purposes of this Guaranty, and Guarantors shall (i)

immediately pay directly to Tribeca all such Obligations owing to Tribeca by reason of acceleration or otherwise (including without limitation, any rent, liquidated damages, principal or interest payments or balances … fees, other installments or any other accrued or unaccrued amounts with respect to such Obligations), irrespective of whether a Default exists relating to Analar, and notwithstanding any stay, injunction or other prohibition preventing acceleration of any Obligations against Analar, and (ii) promptly perform all other Obligations. Guarantors shall be liable, as principal obligor and not as a surety or guarantor only, for all actual attorneys' fees and other costs and expenses incurred by Tribeca in connection with Tribeca's enforcement of this Guaranty, together with interest on all amounts recoverable under this Guaranty, compounded monthly in arrears, from the time such amounts become due and payable until the date of payment at the lesser of Tribeca's then current late charge rate of interest or the highest rate permitted by applicable law. If Tribeca is required to return any payment made to Tribeca by or on behalf of Analar, whether as a result of Analar's bankruptcy, reorganization or otherwise, Guarantors acknowledges that this Guaranty covers all such amounts, notwithstanding that the original of this Guaranty may have been returned to Guarantors and/or otherwise canceled."

33.     Helo and Hyman were subsequently released from their obligations under the Guaranty.

34.     Mr. Renz was not released from his obligations under the Guaranty and Mr. Renz currently remains legally obliged under the Guaranty.

35.     Indeed, the Guaranty provides in relevant part that "Tribeca may release, or settle with … Analar, any Guarantors, or any other party liable, directly or indirectly, for the performance of any Obligation, all without affecting the liability of any other party to this Guaranty."

36.     Once Mr. Renz passed away, the Estate became legally responsible for Mr. Renz's liabilities, including Mr. Renz's obligations under the Guaranty.

D. Analar's Breach of the APA and its Continued Refusal to Honor its Terms

37.     In violation of the APA, Analar failed to purchase the Aircraft by November 20, 2022.

38.     Tribeca advised Analar on multiple occasions that it was in violation of the APA due to its failure to purchase the Aircraft.

39.     Despite repeated requests, Analar continued to knowingly and in bad faith refuse to purchase the Aircraft.

40.     On or about June 5, 2025, Tribeca, Analar, and their respective counsel had a conference call ("June Conference Call") to discuss, among other things, Analar's continued breach of the APA.

41.     On that call, incredibly, Analar admitted that it was knowingly and intentionally breaching the APA, that it planned to continue to breach the APA, and that it had no intention of honoring the terms of the APA.

42.     Analar maliciously and in bad faith maintained this possession despite Tribeca detailing the continuous and significant harm that Analar's breaches of the APA were causing.

43.     In light of Analar's malicious position that it had no intention of satisfying its obligations under the APA, Tribeca decided that, in order to mitigate its damages, it intended to sell the Aircraft without waiving any of its rights and remedies under the APA or any other agreements.

44.     Tribeca hired an aircraft broker ("Broker") to help assist with a swift and efficient sale of the Aircraft.

45.     In August 2025, Tribeca hired a mechanic to conduct an audit and inspection ("Inspection") of the Aircraft to determine its condition and what corrective actions may need to be accomplished to make it marketable for sale.

46.     Tribeca advised Analar that, pursuant to the APA, Analar was responsible for costs and expenses of the Inspection. Analar brazenly refused to pay for such costs despite its legal obligation to do so, thus committing another breach of the APA.

47.     The mechanic who conducted the Inspection issued a detailed report outlining the condition of the Aircraft and the corrective actions that would be needed for both the Aircraft and the records to render the Aircraft airworthy pursuant to FAA requirements ("Inspection Report").

48.     On or about September 10, 2025, Tribeca's counsel sent a detailed email to Analar's counsel attaching the Inspection Report and detailed the various corrective items outlined therein.

49.     Tribeca reminded Analar that it was Analar's obligation to pay for the costs and expenses of the corrective actions and demanded that Analar do so.

50.     Analar's counsel responded that "I can assure you that our client is not in a position to put any money into the aircraft." This is another example in the long history of Analar's knowing and malicious breaches of the APA.

51.     As such, despite that it is Analar's contractual responsibility under the APA, Tribeca anticipates that it will be forced to handle the necessary corrective actions so the Aircraft can be sold given that Analar improperly refuses to honor its obligations in that regard.

52.     Analar's breaches of the APA have directly caused and will cause Tribeca substantial harm, including but not limited to:

      a.  The balance between (i) the actual sale price of the Aircraft once sold; and (ii) the $1,900,000 obligation of Analar under the APA.
      b.  Costs and expenses incurred to repair and/or maintain the Aircraft reasonably necessary for its sale
      c.  Fees/expenses for the Broker.
      d.  Escrow agent fees and costs associated with the Aircraft sale.
      e.  Monthly loan payments (including interest) for each month after the November 20, 2022, closing date in which Analar was obligated to buy the Aircraft but refused.
      f.  Attorneys' fees and costs.
      g.  Yet to be identified fees, costs, expenses, and losses.

E. <u>Analar's Breach of the Lease and its Continued Refusal to Honor its Terms</u>

53.     Starting on or about February of 2024, as a contingent and temporary courtesy, Tribeca agreed to temporarily reduce Analar's Rent under the Lease from $19,000 per month to $15,000 per month for approximately one (1) year.

54.     The temporary Rent reduction was contingent upon Analar timely paying each such reduced Rent payment, along with timely payment of the full Rent payments once the temporary Rent rate expired.

55.     Analar has breached the Lease in that it has not paid any Rent to Tribeca since April 2025.

56.     Analar also breached the Lease in that it failed to satisfy its obligation to maintain, inspect, and repair the Aircraft in accordance with … [Analar's] FAA approved maintenance program, applicable FAA regulations, and the manufacturer's specifications." Indeed, the Inspection Report outlined numerous discrepancies establishing that Analar either negligently or intentionally failed to properly maintain the Aircraft.

57.     Analar further breached the Lease and continues to breach the Lease in that it, among other thing:

      a.  Failed to properly maintain and preserve the Aircraft's records.
      b.  Failed to the maintain the required insurance.
      c.  Failed to provide pilots to operate the Aircraft.
      d.  Failed to operate the Aircraft for its On-Demand Operations.
      e.  Failed to keep the Aircraft airworthy, clean, and orderly.
      f.  Failed to provide the thirty (30) one-way trips between Manhattan and Hamptons Heliports ("30 One-Way Trips").
      g.  Failed to provide the two (2) round trips between a New Hampshire heliport and a Manhattan or Hamptons heliport ("2 Round Trips").

58.     On the June Conference Call, Tribeca, Analar, and their respective counsel discussed, among other things, Analar's continued breach of the Lease.

59.    Analar admitted that it was knowingly and intentionally breaching the Lease, that it planned to continue to breach the Lease, and that it had no intention of honoring the terms of the Lease.

60.    Analar maliciously and in bad faith maintained this possession despite Tribeca detailing the continuous and significant harm that Analar's breaches of the Lease were causing.

61.    Analar's breaches of the Lease have directly caused and will cause Tribeca substantial harm, including but not limited to:

    a.  Rent payments owed by Analar since May 2025 to date, totaling $114,000.
    b.  Rent payments owed and not paid by Analar following the filing of this Complaint.
    c.  The difference between: (i) the Rent payments from February 2024 through March 2025; and (ii) the reduced Rent payments made by Analar during that period, totaling approximately $52,000.
    d.  Diminution in value of the Aircraft due to, among other things, Analar's failure to properly maintain the Aircraft.
    e.  Loss of use of the Aircraft.
    f.  Costs and expenses incurred and associated with alternative travel for Tribeca given Analar's refusal to operate the Aircraft pursuant to the terms of the Lease.
    g.  Attorneys' fees and costs.
    h.  Yet to be identified fees, costs, expenses, and losses.

F.  The Estate's Breach of the Guaranty and its Continued Refusal to Honor its Terms

62.    Upon information and belief, upon Mr. Renz's passing, Mrs. Renz became primarily in control of Analar. As such, Mrs. Renz had actual knowledge of Analar's numerous and continued breaches of the APA and the Lease.

63.    Tribeca specifically notified Mrs. Renz on multiple occasions of Analar's numerous and continued breaches of the APA and the Lease.

64.    Pursuant to the Guaranty, Tribeca made numerous demands to Mrs. Renz, as the administratrix of the Estate, for the Estate honor Mr. Renz's obligations under the Guaranty, including but not limited to: "(i) immediately pay directly to Tribeca all such Obligations owing

to Tribeca by reason of acceleration or otherwise (including without limitation, any rent, liquidated damages, principal or interest payments or balances ... fees, other installments or any other accrued or unaccrued amounts with respect to such Obligations), irrespective of whether a Default exists relating to Analar, and notwithstanding any stay, injunction or other prohibition preventing acceleration of any Obligations against Analar, and (ii) promptly perform all other Obligations."

65.    Mrs. Renz, on behalf of the Estate, repeatedly refused, acknowledging that such refusal was a knowing and intentional breach of the Guaranty, and that the Estate had no intention of honoring its obligations under the Guaranty.

66.    As a direct result of the Estate's breaches of the Guaranty, the Estate has caused and will continue to cause substantial harm to Tribeca, including but not limited to the damages outlined in detail above.

67.    Additionally, pursuant to the Guaranty, the Estate "shall be liable, as principal obligor and not as a surety or guarantor only, for all actual attorneys' fees and other costs and expenses incurred by Tribeca in connection with Tribeca's enforcement of this Guaranty, together with interest on all amounts recoverable under this Guaranty, compounded monthly in arrears, from the time such amounts become due and payable until the date of payment at the lesser of Tribeca's then current late charge rate of interest or the highest rate permitted by applicable law."

## FIRST CAUSE OF ACTION
## <u>BREACH OF CONTRACT AS TO ANALAR – APA</u>

68.    Tribeca realleges Paragraphs 1-67 above and incorporate them by reference as if sully set forth herein.

69.    Tribeca and Analar formed and are parties to the APA.

70.    Tribeca has fully fulfilled its obligations under the APA and/or its performance has been legally excused by Analar's conduct.

71.     Analar's acts as more fully set forth above, as well as other acts yet to be uncovered, constitute material breaches of the APA.

72.     As a direct and proximate result of Analar's breaches of the APA, Tribeca has suffered and continues to suffer damages as more fully set forth above in an amount that is yet to be determined.

**SECOND CAUSE OF ACTION**
**BREACH OF CONTRACT AS TO ANALAR – LEASE**

73.     Tribeca realleges Paragraphs 1-72 above and incorporate them by reference as if sully set forth herein.

74.     Tribeca and Analar formed and are parties to the Lease.

75.     Tribeca has fully fulfilled its obligations under the Lease and/or its performance has been legally excused by Analar's conduct.

76.     Analar's acts as more fully set forth above, as well as other acts yet to be uncovered, constitute material breaches of the Lease.

77.     As a direct and proximate result of Analar's breaches of the Lease, Tribeca has suffered and continues to suffer damages as more fully set forth above in an amount that is yet to be determined.

**THIRD CAUSE OF ACTION**
**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING AS TO ANALAR - APA**

78.     Tribeca realleges Paragraphs 1-77 above and incorporate them by reference as if sully set forth herein.

79.     Implied in all contracts governed by New York is a covenant of good faith and fair dealing, which obligates the parties to act in good faith, to use their best efforts to deal fairly with one another, and to avoid impeding the other party from obtaining the benefits of the contract.

80.     Tribeca and Analar formed and are parties to the APA.

81.     Tribeca has fully fulfilled its obligations under the APA and/or its performance has been legally excused by Analar's conduct.

82.     Analar has breached the implied covenant of good faith and fair dealing by, among other things: (i) knowingly and intentionally refusing to purchase the Aircraft as required by the APA; (ii) refusing to satisfy its obligation to maintain and insure the Aircraft following its refusal to purchase the Aircraft; and (iii) knowingly and intentionally taking actions and/or failing to take action to allow Tribeca to sell the Aircraft to a third party to mitigate its damages.

83.     Analar's conduct has been undertaken willfully, in bad faith, and without justification, thereby depriving Tribeca of the benefits of the APA.

84.     As a direct and proximate result of Analar's breach of the implied covenant of good faith and fair dealing, Tribeca has suffered and continues to suffer damages as more fully set forth above in an amount that is yet to be determined.

**FOURTH CAUSE OF ACTION**
**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING AS TO ANALAR – LEASE**

85.     Tribeca realleges Paragraphs 1-84 above and incorporate them by reference as if sully set forth herein.

86.     Implied in all contracts governed by New York is a covenant of good faith and fair dealing, which obligates the parties to act in good faith, to use their best efforts to deal fairly with one another, and to avoid impeding the other party from obtaining the benefits of the contract.

87.     Tribeca and Analar formed and are parties to the Lease.

88.     Tribeca has fully fulfilled its obligations under the Lease and/or its performance has been legally excused by Analar's conduct.

89.     Analar has breached the implied covenant of good faith and fair dealing by, among other things: (i) knowingly and intentionally refusing to pay Rent payments to Tribeca; (ii) refusing to satisfy its obligation to maintain and insure the Aircraft; and (iii) refusing to satisfy its obligation to provide agreed-upon trips to Tribeca as set forth in the Lease; and (iv) refusing to operate the Aircraft for its On-Demand Operations.

90.     Analar's conduct has been undertaken willfully, in bad faith, and without justification, thereby depriving Tribeca of the benefits of the Lease.

91.     As a direct and proximate result of Analar's breach of the implied covenant of good faith and fair dealing, Tribeca has suffered and continues to suffer damages as more fully set forth above in an amount that is yet to be determined.

## FIFTH CAUSE OF ACTION
## FRAUD IN THE INDUCEMENT AS TO ANALAR

92.     Tribeca realleges Paragraphs 1-91 above and incorporate them by reference as if sully set forth herein.

93.     In connection with the negotiations for the Lease, Analar, through its officers and agents, represented to Tribeca that:

    a.  Analar intended to purchase the Aircraft from Tribeca within one year pursuant to the APA.
    b.  Analar had the ability to operate the Aircraft for its On-Demand Operations.
    c.  Analar had the ability to provide the 30 One-Way Trips and 2 Round Trips per the Lease.
    d.  Analar had the ability to pay the monthly Rent per the Lease.

94.     These material representations concerned Analar's then-present intent and ability to perform, not mere promises of future performance.

95.    At the time Analar made these material representations, Analar knew and/or reasonably should have known that it had no present intent to purchase the Aircraft within one year and/or knew that it lacked the financial ability to do so.

96.    At the time Analar made these material representations, Analar knew and/or reasonably should have known that it had no present intent to pay the monthly Rent per the Lease and/or knew that it lacked the financial ability to do so.

97.    At the time Analar made these material representations, Analar knew and/or reasonably should have known that it had no present intent to provide the 30 One-Way Trips and 2 Round Trips and/or knew that it lacked the financial ability to do so.

98.    Indeed, Analar made no effort whatsoever to purchase the Aircraft.

99.    Moreover, Analar's malicious and willful intention is further evidence by its admissions on the June Conference Call that Analar was knowingly and intentionally breaching the APA and the Lease, that it planned to continue to breach the APA and the Lease, and that it had no intention of honoring its obligations under the APA and/or the Lease.

100.    Analar made these misrepresentations and omissions for the express purpose of inducing Tribeca to enter into the Lease.

101.    Tribeca reasonably and justifiably relied on Analar's representations in entering into the Lease.

102.    Tribeca would not have entered into the Lease, or would have done so on materially different terms, had it known Analar's true intent and financial condition.

103.    Indeed, absent Analar's misrepresentations and omissions, Tribeca would have leased the Aircraft to an operator who was actually equipped to operate the Aircraft.

104.    As a direct and proximate result of Analar's fraudulent inducement, Tribeca has suffered and continues to suffer significant damages as more fully set forth above in an amount that is yet to be determined.

105.    Analar's conduct was malicious, wanton, and in willful disregard of Tribeca's rights, entitling Tribeca to punitive damages in an amount to be determined at trial.

106.    Punitive damages are particularly warranted here given that Analar continues to hold itself out to the public to manage and operate aircraft using similar arrangements and business terms as those at issue here, and punitive damages would prevent Analar from committing similar knowing and intentional misconduct against other members of the public.

**SIXTH CAUSE OF ACTION**
**<u>NEGLIGENT MISREPRESENTATION AS TO ANALAR</u>**

107.    Tribeca realleges Paragraphs 1-106 above and incorporate them by reference as if sully set forth herein.

108.    In connection with the negotiations for the Lease, Analar, through its officers and agents, represented to Tribeca that:

  a.  Analar intended to purchase the Aircraft from Tribeca within one year pursuant to the APA.
  b.  Analar had the ability to operate the Aircraft for its On-Demand Operations.
  c.  Analar had the ability to provide the 30 One-Way Trips and 2 Round Trips per the Lease.
  d.  Analar had the ability to pay the monthly Rent per the Lease.

109.    These material representations concerned Analar's then-present intent and ability to perform, not mere promises of future performance.

110.    These material representations were inaccurate and/or misleading and Analar reasonably should have known that such representations were inaccurate or misleading.

111.    Analar negligently provided this information without exercising reasonable care or competence in obtaining or communicating such information.

112.    Tribeca reasonably and expressly relied on these material misrepresentations in deciding to enter into the Lease.

113.    Tribeca's reliance on Analar's material misrepresentations was justified under the circumstances

114.    As a direct and proximate result of Analar's material misrepresentations, Tribeca has suffered and continues to suffer damages as more fully set forth above in an amount that is yet to be determined.

**SEVENTH CAUSE OF ACTION**
**ACCOUNTING AS TO ANALAR**

115.    Tribeca realleges Paragraphs 1-114 above and incorporate them by reference as if sully set forth herein.

116.    As set forth above, and given Analar's broad discretion over all affairs related to the Aircraft under the Lease and Tribeca's heightened reliance and trust in Analar's management decisions, a fiduciary relationship exists between Analar and Tribeca.

117.    Analar is in complete control of its financial records, funds, and/or property relating to the Aircraft, the Lease, and the APA, which would establish the extent to which Analar has received, diverted, retained, and/or transferred money or other benefits or things of value by the aforementioned acts alleged herein.

118.    As a result, Analar has a duty to account for money wrongfully received, diverted, retained, and/or transferred.

119.    Moreover, given Plaintiff's contention that a reason for its breaches of the APA and the Lease are, at least in part, due to solvency and/or inability to pay, Tribeca is entitled to a broad accounting to analyze the veracity of Analar's contention.

120.    At various times, Tribeca demanded an accounting, which Analar has refused.

121.    Tribeca may have no adequate remedy at law.

122.    As a direct and proximate result of the foregoing, Tribeca has suffered and continues to suffer damages as more fully set forth above in an amount that is yet to be determined.

### EIGHTH CAUSE OF ACTION
### <u>BREACH OF THE GUARANTY AS TO THE ESTATE</u>

123.    Tribeca realleges Paragraphs 1-122 above and incorporate them by reference as if sully set forth herein

124.    Tribeca and Analar formed and are parties to the APA.

125.    Tribeca and Analar formed and are parties to the Lease.

126.    Mr. Renz executed the Guaranty in favor of Tribeca, guaranteeing Tribeca the prompt payment and performance of all of Analar's obligations under the Lease and the APA.

127.    Analar has failed and/or refused to perform various obligations in both the Lease and the APA as set forth in more detail above, thus constituting breaches of both the Lease and the APA.

128.    In light of Analar's breaches, and pursuant to the Guaranty, the Estate is liable to Tribeca for: (i) the performance of all obligations under the Lease and the APA; and (ii) all amounts due and owing from Analar under the Lease and the APA.

129.    In light of Analar's breaches, and pursuant to the Guaranty, Tribeca demanded that the Estate satisfy Mr. Renz's obligations under the Guaranty and pay and/or perform all of Analar's obligations under the Lease and the APA.

130.    The Estate refused and continues to refuse to satisfy Mr. Renz's obligations under the Guaranty.

131.    Tribeca has fully fulfilled its obligations under the Guaranty, if any, and/or its performance has been legally excused by Analar's and/or the Estates conduct.

132.    As a direct and proximate result of the foregoing, Tribeca has suffered and continues to suffer damages as more fully set forth above in an amount that is yet to be determined.

## PRAYER FOR RELIEF

WHEREFORE, Tribeca has been damaged by Defendants and respectfully requests judgment as follows:

1.    Tribeca's compensatory, incidental, consequential, and/or special damages, in an amount to be determined at trial.

2.    Tribeca's attorneys' fees and costs.

3.    Punitive damages.

4.    Interest on all amounts recoverable under the Guaranty, the APA, and/or the Lease pursuant to their terms, compounded monthly in arrears at the highest rate permitted by applicable law.

5.    Prejudgment interest pursuant to CPLR § 5001.

6.    Requiring Defendants' specific performance as required in the APA and/or the Guaranty.

7.    An accounting of Analar's financial records as set forth more fully above.

8.    Such other legal and/or equitable relief as this Court deems just and proper.

Respectfully submitted,

PLAINTIFF,

Tribeca Heli, LLC


By: _____
Paul M. Grocki, ct29563
Law Offices of Paul A. Lange, LLC
80 Ferry Boulevard
Stratford, CT 06615-6079
Tel: (203) 375-7724
Fax: (203) 375-9397
Email: pmg@lopal.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on October 24, 2025, a copy of the foregoing

Plaintiff's Complaint was served on Defendants' counsel via electronic mail as follows:

Gaetano C. Lanciano, Esq.
Lanciano & Associates, LLC
*Attorneys for Defendants:*
*Analar Corporation a/k/a Analar Helicopter Corporation*
*and the Estate of Michael Renz*
2 Route 31 North
Pennington, NJ 08534
Phone: (609) 250-6464
Email: gcl@lancianolaw.com

_____
Paul M. Grocki